STATE of Iowa, Appellee,

v.

Charles Calvin JACKSON, Appellant.

No. 59988.

Supreme Court of Iowa.

Nov. 23, 1977.

Carlin & Darbyshire by Anne L. Spitzer, of Davenport, for appellant.

Richard C. Turner, Atty. Gen., Richard H. Doyle, IV, Asst. Atty. Gen., and Elizabeth O. Shaw, Scott County Atty., Davenport, for appellee.

Heard by MOORE, C. J., and RAWLINGS, REES, UHLENHOPP and McCORMICK, JJ.

UHLENHOPP, Justice.

This appeal involves two problems which arose in a prosecution of defendant Charles Calvin Jackson for assault with intent to commit murder.

The jury could find from the evidence that on the evening of June 12, 1976, Brenda Beechum went to the races with defendant and then went to defendant's apartment shortly after midnight. They had an argument and defendant physically injured her. Defendant had a .38 calibre handgun, and Beechum was afraid. She left and went to the apartment where Ollie Jean Edwards and Debbie Arthur, sisters, resided. Arthur was there.

Defendant came to that apartment and pushed in the door; he had his handgun. He then left and drove to an alley behind a place called Freeman's Tap.

Next, Arthur found her sister Edwards at a cafe and told her what had happened. Edwards, irate, walked to defendant's car and castigated him about causing trouble at the apartment and damaging the door. Arthur testified:

I followed my sister to the alley as she went to speak to the defendant. Defendant's sister and a Willie were also around defendant's car. My sister had a conversation with defendant and he shot her. I saw the gun when defendant pulled it up to shoot it. I didn't see my sister with any weapon nor did she make any kind of movement toward defendant. Defendant drove off after the shooting.

Willie Hubert, the person mentioned by Arthur, testified:

I saw Ollie Jean Edward talking to defendant by his car. I saw Debbie Arthur in the area. I was standing beside the car and so was defendant's sister. Ollie and defendant had a conversation and defendant pulled a gun out and shot her. I saw no weapons in Ollie's hands nor did she make any kind of move toward defendant. Ollie fell and defendant got into his car and left.

Alene Oliver, Edwards' aunt, testified:

I went downstairs and observed the defendant and Ollie in the alley. They were talking over the driver's door in the car. Defendant pulled out a gun and shot Ollie. I saw no weapon in Ollie's possession nor did I see her make a move towards defendant.

Edwards, confined to a hospital, testified simultaneously by video tape and by stenographic report in a deposition. In the video tape, which was introduced at trial, she testified in part:

Q. And what did you say to him [defendant]? A. I asked Mr. Jackson what happened; and he said, "What happened when?" I said, "Just a few minutes ago at my house. They told me that you kicked the door in." . . .

Q. And what was his answer to that? A. He never did answer. It's like I said, his sister spoke up then. . . .

Q. And what was this—your conversation with his sister? . . . A. She was saying that it wasn't nothing, no big hassle because the door could be replaced. I said, "Yes, the door can be replaced, but that's not the point of it. The point of it is I've lived there for two years and he's never been to my house; I've never been to his. We have no association at any time. . . .

Q. Okay. What happened then, Ollie? A. Then I turned around to talk to him and he said, "So you call yourself taking up for Brenda." A shot went off. I heard my sister scream. I thought she had gotten shot. I moved away from the car and just about the time that I did, I fell, and I must have blacked out for a few minutes because the next thing that I remember was my aunt was leaning over me and she was telling me to lie still; and I said, "No, I got to get to Debbie. I got to get to Debbie 'cause she's shot." And she said, "No, she's not; you're the one that's shot. Just lay here, the ambulance is coming." . . .

Q. Did you have a gun in your purse? A. No, I did not.

Q. You are sure about that? A. I'm positive. I'm scared of guns.

Edwards also testified, "It didn't hit me in the neck area, it hit me right here in the chest but the bullet lodged through and came out the back of my head where they had—they had to do neurosurgery in the back of my head to get the bullet out."

In his brief, defendant describes the video picture thus:

The deponent [Edwards] appeared seated in a wheel chair. Her neck was slightly bent to the left throughout her deposition, and she wore what appeared to be a cervical collar around her neck. Head movement appeared to be limited. From her shoulders a complicated set of slings and suspensions supported what appeared to be two large arm rests. In the course of being sworn in the deponent moved her right arm with apparent freedom, and in the course of the deposition moved both arms to gesture. At rest the arms were sometimes on the table and sometimes appeared to be resting in the sling apparatus. Otherwise she appeared as a young black woman wearing dark clothing. She seemed to limit her movement, but to be in no pain. Her voice was thin, but clear and at times emphatic.

Defendant's sister Delores Nunn testified on his behalf that she saw a gun in Edwards' purse. Defendant testified that Edwards pulled a gun on him at the car, and he shot her.

The jury found defendant guilty of assault with intent to commit manslaughter, and the trial court sentenced him to the penitentiary not exceeding five years. Defendant appealed.

I. At trial the State introduced evidence that the videotape accurately reflected what it purported to show and what deponent said. The State then offered the videotape into evidence. Defendant objected on these grounds: "One, videotape depositions, in general, have not achieved the degree of scientific accuracy necessary for admission by any court; two, the use of the videotape deposition in this case will be highly prejudicial to the defendant Charles Calvin Jackson because the jury will be strongly inclined to place excessive empha-

sis on said videotape deposition and will neglect or undervalue all testimony of defendant or defendant's witnesses; three, the use of such videotape deposition will inevitably have a stronger effect on the jury than would oral testimony from the same witness, even though such witness would in the courtroom testify from a bed or wheel chair; four, there are no Iowa cases delineating the parameters of Rule 140(b)(4) and 148 of the Iowa Rules of Civil Procedure." The trial court overruled the objection.

■ Defendant is of course confined to the grounds of objection interposed in district court; he cannot try one case there and a different one here. *State v. Fowler,* 248 N.W.2d 511 (Iowa); *State v. Nowlin,* 244 N.W.2d 596 (Iowa). We emphasize that we thus confine our consideration of defendant's contentions on appeal to those having a foundation in the objections presented to the trial court.

Early in his brief defendant-appellant states:

Appellant is not raising any issue as to the scientific accuracy of video-tape, nor as to the admissibility of video-tape in general. In view of the case law in this and other jurisdictions, such an attempt would be frivolous. Appellant is asking the court to consider the question of whether the video-tape should have been admitted in the particular circumstances of this case.

It is appellant's contention that the tape should not have been admitted because of its highly prejudicial effect and because the State made no showing that the witness could not appear at trial.

■ We deem the latter objection—no showing witness unavailable—to be beyond the objection lodged at trial. Defendant argues that the evidence "suggests, but does not establish, that [Edwards] was at the time suffering from quadriplegia, and was severely paralyzed." Had defendant objected at trial on the ground now urged, the prosecutor would have been able to try to adduce proof of unavailability, in addition to the substantial foundation evidence

he did introduce of the accuracy of the videotape. Defendant's contention as to unavailability comes too late. We do not suggest that such objection would, or would not, have been good if urged at trial.

Defendant's objection, however, as to the prejudicial effect of the videotape comes within the second and third grounds of the objection made at trial. Defendant argues that the stenographic report should have been introduced.

The situation then is this. The deposition of the victim of an alleged assault is taken simultaneously by videotape and by stenographic report. The video accurately shows deponent as she was and the tape accurately states her testimony, according to the foundation evidence. But defendant insists that the videotape is too potent and that the stenographic report should have been used.

■ The trial court rejected the contention and so do we. Evidence is not to be rejected merely because of its potency. Parties strive to obtain and introduce the most graphic and forceful evidence available. Had the prosecutor produced Edwards in person on a bed or in a wheelchair, he would probably have made the most powerful presentation; he did the next best thing for the prosecution by using the videotape, and he was not required to go down the third step to the more sterile typewritten report. The trial court did not err in overruling the objection. *Paramore v. State,* 229 So.2d 855 (Fla.), vacated on other grounds 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751; *People v. Mines,* 132 Ill. App.2d 628, 270 N.E.2d 265; *People v. Heading,* 39 Mich.App. 126, 197 N.W.2d 325; *State v. Lusk,* 452 S.W.2d 219 (Mo.); *State v. Thurman,* 84 N.M. 5, 498 P.2d 697; *State v. Johnson,* 18 N.C.App. 606, 197 S.E.2d 592; *Williams v. State,* 542 P.2d 554 (Okl.Cr.), vacated on other grounds 428 U.S. 907, 96 S.Ct. 3218, 49 L.Ed.2d 1215, overruled on other grounds, 554 P.2d 109; *Williams v. State,* 461 S.W.2d 614 (Tex.Cr.App.); *State v. Hewett,* 86 Wash.2d 487, 545 P.2d 1201; *State v. Hunt,* 53 Wis.2d 734, 193 N.W.2d 858.

We hold that defendant's assignments of error regarding the videotape are not well taken.

II. Defendant contends the trial court erred in overruling an objection he interposed during the prosecutor's cross-examination of defendant's sister, Delores Nunn. Since the charge was assault with intent to commit murder, defendant's state of mind was involved.

By the time Nunn testified the State had introduced its evidence that defendant had gone with a gun to the apartment of Arthur and Edwards, knocked in the door, and fought with Beechum. On Nunn's direct examination she testified that she was at home during the day preceding the shooting, and went to Freeman Tap about 11:30 p. m. She was with Willie Hubert. She saw defendant drive up and park in or near the alley, and she and Hubert went to defendant and talked with him. She saw Edwards and Arthur approach and heard Edwards reprove defendant about kicking in the apartment door. She saw the shooting, and testified she then saw a small calibre handgun in Edwards' purse on the ground beside Edwards.

On cross-examination, Nunn testified she heard the testimony of the State's witnesses. Then this occurred:

Q. [Prosecutor] You weren't with Charles and you didn't see Charles earlier in the evening when he was out with Brenda Beechum, did you? A. No, I didn't.

Q. So you didn't see him have a fight with her or beat her up? A. No, I didn't.

Q. You didn't see him pull a gun on her? A. No, I didn't.

Q. You didn't see him when he was at Debbie Arthur's apartment earlier that evening—

Mr. Metcalf [trial defense attorney]: Just a minute. I object to this questioning as beyond the scope of direct examination, therefore, improper cross-examination.

The Court: I think it's within the general scope of the testimony given by the witness and is permissible cross-examination. You may proceed.

Q. You didn't see Charles when he was at Debbie Arthur and Ollie's apartment earlier? A. I didn't see him at all.

Q. So you weren't there when he—you don't know whether he did, in fact, kick in the door of that apartment? A. No, I don't.

Defendant contends that the court's ruling allowing this line of testimony entitles him to a new trial.

We are not so persuaded. This is not a case of cross-examination of the defendant, falling under § 781.13 of the Code ("but the state shall be strictly confined therein to the matters testified to in the examination in chief"). But we do not suggest that the result would be different if the cross-examination had been of defendant. See *State v. Jensen*, 189 N.W.2d 919, 923–924 (Iowa) (defendant as a witness: "We do not mean to say the prosecutor can only parrot the questions propounded on direct. Cross-examination may deal with the *matters* inquired into on direct, and questions fairly within the area of those matters constitute proper cross-examination."). We are dealing here instead with the scope of cross-examination of a non-party witness. We have stated that the scope of permissible cross-examination is "largely" within the trial court's discretion. *State v. Everett*, 214 N.W.2d 214, 219 (Iowa) ("The scope and extent of cross-examination is largely within trial court discretion."); *State v. Hinsey*, 200 N.W.2d 810, 816 (Iowa) (same). See McCormick, Evidence, § 29 at 59 (2nd ed.) ("Consequently, the trial judge has a recognized discretionary power to control the extent of examination. This discretion will only be reviewed for abuse resulting in substantial harm to the complaining party. An examination of a large number of these cases leaves the impression that in practice abuse is more often found when complaint is made that the judge has unduly curbed the examination than when undue extension of the discretion to permit the questioning is charged.").

In this case Nunn had testified that she had been at home and that she then went to Freeman Tap. The trial court could conclude that the prosecutor sought to drive home to the jury that Nunn therefore knew nothing about the events of the evening at the apartment—she was not there and she did not see what happened; and that the prosecutor sought to show the jury that Nunn's knowledge was limited to the very last event in the chain of facts. On this record and under the rule that the extent of cross-examination is largely discretionary with the trial court, we are unwilling to overturn the ruling.

We thus uphold the judgment and sentence.

AFFIRMED.