**STATE of Iowa, Appellee,**

v.

**Gentric HICKS, Appellant.**

**Gentric HICKS, Appellant,**

v.

**Lou V. BREWER, Appellee.**

**Nos. 60440, 61532.**

Supreme Court of Iowa.

April 25, 1979.

890

Barry M. Anderson and M. Carl McMurray, of Anderson & McMurray, Keokuk, for appellant.

Thomas J. Miller, Atty. Gen., Ann Fitzgibbons, Asst. Atty. Gen., and Gary L. Wiegel, Henry County Atty., for appellees.

Considered by LeGRAND, P. J., and UHLENHOPP, HARRIS, McGIVERIN and LARSON, JJ.

UHLENHOPP, Justice.

Defendant Gentric Hicks challenges his conviction of first-degree murder in these consolidated appeals from the conviction and from denial of postconviction relief.

At approximately 3:00 a. m. on May 23, 1976, a black male entered the Hillcrest Motel near Fort Madison, Iowa. Lorraine Foster admitted the man. Shortly thereafter the man pulled a gun and asked for money. During the course of the robbery Mrs. Foster's son Jerry appeared on the scene. Jerry attempted to talk the man into giving him the gun. A struggle ensued and Jerry was fatally shot. The robber fled.

Meanwhile, Jimmie Foster (Jerry's father) had gone outside and cornered Kenneth Wayne Lawrence. Lawrence had been sitting in his car outside the motel. At that time Lawrence told Foster that the man in the motel was Willie Jefferson. After the shooting the police were called and began their hunt for the robber.

Mrs. Foster provided the police with a description of the man. Lawrence was arrested and changed his story to implicate Gentric Hicks. Officers showed Mrs. Foster pictures of several black men, including Hicks, and she identified Hicks as the robber. She also identified him at a later lineup. Hicks was tried and found guilty of first-degree murder.

At trial Hicks claimed he was not at the Hillcrest Motel that morning. He asserted that Willie Jefferson, his half-brother, may have committed the crime. The evidence indicated that Hicks and Lawrence spent the evening together. Hicks claimed he fell asleep in Lawrence's car and woke up much later in the hallway of an apartment building. Lawrence testified he drove Hicks to the motel where the robbery occurred. Mrs. Foster testified at trial that Hicks was the robber, and the State also introduced fingerprint comparisons which implicated him.

Hicks sought postconviction relief, which was denied. He directly appealed from his conviction and also appeared from the postconviction decision. In his appeals he claims several errors were committed by the district court.

■ I. *Identification.* Hicks' first assigned error concerns procedures used to identify him following the homicide.

After Lawrence implicated Hicks and before Hicks' arrest, several officers compiled a group of photographs to show to Mrs. Foster. They showed her seven or eight black-and-white photographs of black men. Mrs. Foster picked out Hicks' picture. Hicks argues the photographic array was improperly suggestive; we set out his major complaints.

Testimony was presented that the photographs were simultaneously placed on a table in a well-lit room within five hours of the crime. According to the evidence, Mrs. Foster took her time before choosing Hicks' picture. Agent Swaim of the Iowa Bureau of Criminal Investigation testified at trial that "she did study each photograph carefully, but made a positive identification of [Hicks' photograph]."

At a suppression hearing Mrs. Foster testified regarding the photographs: "I went over and I picked out [Hicks] and then I said, 'There's another one there that's, you know, a profile of this man that was in my home that killed my son.'" Although police officers present at the array deny that Mrs. Foster picked out two pictures, defendant argues that either two photographs of Hicks were shown her or she picked out a profile of someone else whom she thought was the man.

Additionally, two pictures, one of them of Hicks, had height markings. Defendant argues this was suggestive since Hicks' height fits Mrs. Foster's description of the assailant's height.

Defendant further contends that the array was improperly suggestive because the police did not show her a picture of Willie Jefferson.

Mrs. Foster again identified Hicks at a lineup, arranged at his request after his arrest. The sheriff asked a group of black men from the community to form a lineup. Unknown to defendant, Mrs. Foster had already picked him from the photographs and had also seen a newspaper picture of him at the time of his arrest. Defendant argues this identification was thus tainted, and was further tainted by indications at the time by a member of the lineup and by Mr. Foster that Hicks was the man. Mr. Foster had been unable to identify the robber but had seen Hicks' picture in the newspaper. Mrs. Foster testified, however, that she identified Hicks immediately upon entering the room where the men were lined up.

Hicks contends the identification procedures were "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law," citing *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967). He urges on appeal that a new trial be granted in which Mrs. Foster is prohibited from testifying or identifying Hicks.

Assuming that the identification procedures were suggestive, Hicks is not automatically granted a new trial. *See State v. Washington,* 257 N.W.2d 890, 894 (Iowa 1977), *cert. denied,* 435 U.S. 1008, 98 S.Ct. 1881, 56 L.Ed.2d 390 (1978); *State v. McManus,* 263 N.W.2d 556, 558 (Iowa Ct.App. 1977); *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In *Manson* the United States Supreme Court rejected a per se exclusion of such evidence. Instead it laid down the rule that a court must determine whether the circumstances indicate the challenged identification was reliable. If so, the pre-trial and in-court identifications are admissible, *Manson v. Brathwaite,* 432 U.S. at 106 n. 9, 110 n. 10, 97 S.Ct. at 2249, 2251, 53 L.Ed.2d at 149, 151; questions regarding the identification can be brought to the jury's attention by cross-examination.

The reliability factors set forth in *Manson* are:

[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154.

Our examination of these factors indicates defendant's request to suppress Mrs. Foster's identification testimony was properly denied. We consider the factors seriatim.

1. Opportunity of the witness to view the robber at the time of the crime. Mrs. Foster had ample opportunity to observe the robber closely. He was in close proximity to her in a well-lit room for approximately ten minutes. She was able to observe him prior to and during the crime. She had sufficient time to observe his face, hands, clothing, demeanor, and general appearance.

2. Degree of attention. Mrs. Foster testified that she got several good looks at the defendant when he first entered the motel. She carried on a conversation with him a few feet away; at trial she stated, "He was right up in front of my face, and this wasn't only just one time, this was several times." After the crime she stated the robber held the gun to her face and "looked me square in the eye." The events were such that Mrs. Foster was not merely a casual, inattentive observer.

3. Accuracy of the description. Mrs. Foster described the robber before the pictures were shown. She relayed information regarding the robber's race, age, height, whiskers, and clothing which matched Hicks' characteristics and clothing. Shortly after the crime she told investigators that she "would recognize [the robber] again if she saw him."

4. Level of certainty demonstrated at the confrontation. Testimony was presented by Mrs. Foster and investigating officers that she exhibited a high degree of certainty at both confrontations.

5. Time span. Mrs. Foster picked out Hicks' picture less than five hours after the crime. Several days later she again picked him from a lineup.

We have examined Hicks' contention that his half-brother Jefferson may have been the robber. Both the police and the defense were unable to locate Jefferson. Testimony was presented that Jefferson stands over six feet tall. Mrs. Foster, who stands 5' 6", was insistent that the robber was near her height; Hicks is slightly taller than she. Jefferson is lighter-colored and thinner than Hicks. Mrs. Foster accurately described Hicks' clothing, height, and other features.

We have balanced the claimed corrupting effect of the identification procedures against the reliability factors. Apropos here is the observation of the United States Supreme Court in *Manson,* 432 U.S. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155: "[W]e cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.' . . . Short of that point, such evidence is for the jury to weigh." A case decided before *Manson* is *State v. Wisniewski,* 171 N.W.2d 882 (Iowa 1969). Error does not appear at this point.

II. *Jury View.* Hicks contends the trial court's refusal to grant his motion for a jury view of two sites was error. The defense asked the trial judge to allow the jury to view (1) "the scene of the ground behind the Hill Crest Motel on Highway 61 . . . *so they can get a first-hand impression of the State's evidence,*" and (2) "the apartment building in question . . . *for the purposes of corroborating testimony* in connection with what Mr. Hicks had done; and also for viewing the fact that there is a gangway or a space between the building[s] . . . ." (Emphasis added.)

■ The decision to grant or deny a jury view request rests within the sound discretion of the trial court. *See* § 780.15, The Code 1975; *State v. Papst,* 221 Iowa 770, 774, 266 N.W. 498, 500 (1936); *State v. Jackson,* 156 Iowa 588, 596, 137 N.W. 1034, 1037 (1912). A trial court's decision is reversible only upon a showing of abuse of discretion. *Banning v. Chicago, Rock Island & Pacific Railway,* 89 Iowa 74, 80, 56 N.W. 277, 278–79 (1893); 5A *C.J.S. Appeal & Error* § 1618, p. 122 (1958). In order to show abuse of discretion, the defendant must prove that the judge's discretion "was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Buck,* 275 N.W.2d 194, 195 (Iowa 1979). Hicks has failed to show the trial court abused its discretion.

We also reject this claimed error because of Hicks' stated purposes. To give the jury a first-hand impression of the State's evidence and to corroborate Hicks' testimony were not appropriate reasons for granting a jury view. This court has stated that the purpose of permitting jury views "is to enable [the jury] to better understand and apply the testimony of witnesses, and not to make them silent witnesses in the case; and that the verdict must be based on the evidence, and not on [the jury's] personal examination." *State v. Ling,* 198 Iowa 598, 601, 199 N.W. 285, 287 (1924). Hicks sought to make the jurors silent witnesses. We find no error here.

■ III. *Fingerprint Testimony.* During the trial the State called Darwin Chapman, a fingerprint expert, to testify about fingerprints he discovered on the back door of the Hillcrest Motel. After Chapman stated that the prints were similar to those of Hicks, the following occurred:

Q. (by prosecutor) It is not your opinion, then, that these—this is what you call in the classical sense a positive comparison? A. That is correct.

Q. Going from there, I would like to now go into the continuum, let's say, from—you know very well that it's not him in working on to the possibility that they are his prints. Do you have an opinion as to what the possibilities are that these prints belong to Gentric Hicks?

The defense attorney objected:

I'm going to object to this as calling for an opinion and conclusion, based on—not scientific evidence, on his own testimony,

and not properly qualifying that the test is going to be run, on a continuum. The prosecutor replied:

May it please the Court, I believe if he has an opinion that it is not necessarily limited to that of a positive comparison—and absolute—the man is an expert, it is his field, it is a matter of his credibility as to whether the jury believes something less than what he labels as absolute—the man is not limited in expert testimony to absolutes.

The court overruled the objection.

The witness then answered the question propounded in the affirmative. The court recessed shortly thereafter. When the trial resumed the prosecutor asked the witness how he arrived at his opinion regarding the fingerprint comparison. After explaining the comparison process the witness was asked for the substance of his opinion:

Q. (prosecutor) Do you have a numerical opinion as to the probabilities that these prints are that there might be another print available or another print identical that would make these impressions? A. Yes I do.

Q. Would you indicate to the jury what that opinion is, as a matter of an opinion, and also how you arrived at it? A. Yes, I will. It is my opinion that the possibility of another individual having the same minutia or individual characteristics that I found in the latent fingerprint as well as the known fingerprints of Mr. Hicks, the chances of another individual having those, not only those same individual characteristics but the same number of them, would be one in approximately seven million.

Chapman then complied with the prosecutor's request to explain the computations he used to arrive at his figure.

On appeal Hicks argues that the numerical testimony was improperly admitted because "[t]here was absolutely no qualification of Mr. Chapman as a mathematical expert in any way, shape or manner." At trial the only objection made regarding this testimony was the earlier objection we quoted. That objection was insufficient to

preserve the error now asserted for two reasons. First, it was premature to preserve error regarding admission of the testimony Hicks now asserts was objectionable. The defense objected after the witness was asked if he had an opinion; the witness was later asked for the substance of his numerical opinion, at which time the comments claimed to be objectionable were made. The earlier objection was insufficient to preserve the error claimed in the later question and answer. Since no objection was lodged at the time the objectionable testimony was received, we have nothing to review. *See State v. Trudo,* 253 N.W.2d 101, 107 (Iowa), *cert. denied,* 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 189 (1977); *State ex rel. Fulton v. Scheetz,* 166 N.W.2d 874, 882 (Iowa 1969).

Second, Hicks is not asserting here the objection asserted at trial. As we stated in *State v. Bean,* 239 N.W.2d 556, 560–61 (Iowa), *cert. denied,* 429 U.S. 824, 97 S.Ct. 76, 50 L.Ed.2d 86 (1976), "It is well settled a party cannot announce one reason for an objection at trial and then, on appeal, rely upon a different one to challenge an adverse ruling." Nor can Hicks amplify his objection on appeal. *State v. Fowler,* 248 N.W.2d 511, 517 (Iowa 1976). Since Hicks does not argue the ground urged below we give no consideration to his present contention. *State v. Janssen,* 239 N.W.2d 564, 569 (Iowa), *cert. denied,* 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976); *State v. Jackson,* 259 N.W.2d 796, 799 (Iowa 1977).

We have nothing here to review.

■ IV. *Sheriff Arnold's Testimony.* In his fourth assigned error Hicks claims the trial court erred in allowing Sheriff Arnold to testify regarding his participation in exhibiting photographs to Mrs. Foster, as the sheriff's testimony was false. The defense contends Sheriff Arnold was not present at the photographic identification proceeding and relies on *State v. King,* 256 N.W.2d 1, 15 (Iowa 1977). We there stated:

[T]he United States Supreme Court has consistently held a conviction obtained by knowing use of perjured testimony is

fundamentally unfair and must be set aside if there is any reasonable likelihood the false testimony could have affected judgment of the jury. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976), and citations.

The record does not provide a basis for this claimed error. Officers showed photographs to Mrs. Foster. She testified at trial:

Q. Do you recall who the officers were that brought the pictures out for you to look at on the morning of the 23rd of May? A. I remember Mr. Arnold, the Sheriff, and Mr.—the other deputy.

Agent Swaim testified at the postconviction hearing:

Q. Do you remember who was present when you did the photo line-up with the Fosters? A. All I remember being present was Sheriff Arnold.

Swaim's testimony at trial is consistent with this statement.

In Sheriff Arnold's testimony at trial and by deposition, he stated that he was present at the photographic array and he provided a detailed description of the identification procedure.

Hicks apparently predicates this asserted error on a report prepared by Deputy Lavern Taft and on Taft's testimony at trial. Taft, in a report filed two days after the crime, wrote:

The 7 pictures were returned to BCI agent Sam Swaim and Sam and myself went to talk with Mrs. Lorraine Foster, who also picked out the picture of Gentry (Gentric) Hicks . . . .

The following direct and cross-examination trial testimony of Deputy Taft is pertinent:

Q. Who showed the pictures in relation— A. Sam Swaim . . . .

Q. And you were along with him? A. Yes, I was there.

. . . .

Q. Do you recall anyone else being in the residence at the time these pictures were shown? A. There were other people there, yes, I know there were other people there—exactly who, I do not know.

Q. Do you recall specifically whether or not Sheriff Arnold was there or not? A. I do not recall specifically, no.

We conclude that Deputy Taft's report and his inability to recall whether Sheriff Arnold was present do not indicate the "knowing use of perjured testimony," especially in light of the testimony of Mrs. Foster, Agent Swaim, and Sheriff Arnold.

V. *Venue.* Hicks also argues that the trial court abused its discretion by not allowing a second change of venue. Hicks was initially granted a change of venue from Fort Madison to Mt. Pleasant because of prejudice or excitement. He sought a second change "to another county where the possibility exists that there would be blacks on the jury."

The trial court did not err in denying Hicks' request. We stated in *State v. King,* 225 N.W.2d 337, 342 (Iowa 1975):

A criminal defendant's right to an impartial jury does not guarantee representation of his race on the jury panel. One contending he has been denied that right carries the burden to come forward with evidence showing systematic exclusion of an identifiable eligible group from the jury panel. *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184, 193; *Swain v. Alabama,* 380 U.S. 202, 203–205, 85 S.Ct. 824, 827, 13 L.Ed.2d 759, 763, 764.

No systematic exclusion of any group appears here.

VI. *Effectiveness of Counsel.* Hicks also questions the adequacy of his legal representation. This is not the usual case where the defendant has retained different counsel on appeal and questions the representation received by trial counsel. Hicks' counsel on appeal was his trial counsel. He questions his *pre-trial* representation. The record indicates that Hicks was represented by the attorney in question from the date of his arrest, May 23, 1976, until September 27, 1976. His present counsel was appointed on September 27, 1976, and trial commenced December 6, 1976.

The standard employed in judging the quality of legal representation is "'whether in all the circumstances counsel's performance was within the range of normal competency.'" In addition, "Defendant has the burden of proving ineffectiveness of counsel." *State v. Veverka,* 271 N.W.2d 744, 750 (Iowa 1978).

After reviewing the record we conclude that Hicks has failed to prove that his pre-trial counsel was not "within the range of normal competency." Hicks argues that his original attorney was inexperienced and had conflicts of interest, but he cites few acts or omissions which indicate ineffectiveness of counsel. His major complaint was the attorney's failure to obtain police reports and to depose certain witnesses. He also contends the attorney was ineffective because the attorney asked for a lineup (at Hicks' insistence) without knowing that a photographic array had previously been shown to the witnesses.

Hicks' claims do not add up to ineffective representation. Hicks was represented for over two months before trial and at trial by experienced, independent counsel; any conflicts of interest vanished once new counsel was appointed. The record shows the first attorney requested reports and deposed the main witnesses. Hicks' present counsel deposed the three witnesses that the defendant now complains should have been deposed by his first attorney. Present counsel had two months to conduct additional discovery and to prepare the case in accordance with Hicks' wishes. We took Hicks' complaint about the lineup into account in our review of the identification proceedings.

We do not find merit in the sixth assigned error.

VII. *Newly Discovered Evidence.* On his postconviction appeal Hicks suggests the trial court erred by denying a new-trial motion based on newly discovered evidence.

Hicks' newly discovered evidence does not justify the granting of a new trial. The evidence is merely cumulative or impeaching, and it would probably not change the result if a new trial was granted. *See*

*State v. Sims,* 239 N.W.2d 550, 554–55 (Iowa 1976).

Hicks has the burden of establishing the requirements for a new-trial grant on the basis of newly discovered evidence. *State v. Compiano,* 261 Iowa 509, 518, 154 N.W.2d 845, 850 (1967). *See also State v. Jackson,* 223 N.W.2d 229, 233 (Iowa 1974) (Motions for new trial on the basis of newly discovered evidence "are not favored in the law and should be closely scrutinized and sparingly granted." Also, "This court will not interfere with the trial court's ruling on such a motion unless it is reasonably clear the court abused its discretion.").

Our review of the evidence supports the trial court's refusal to grant a new trial on this ground. We have examined each allegation which Hicks asserts. He first contends that newly discovered testimony of Val and Earl Vincent is material. At trial Hicks testified that he and Lawrence were at the Hi-Ho tavern in Keokuk until sometime after one o'clock on the morning of the Foster homicide. At this point Hicks' and Lawrence's stories conflicted. Hicks testified that he left with Lawrence and fell asleep in the car, and that he remembered nothing prior to awakening in the hallway of an apartment building several hours later. Lawrence testified that after leaving the Hi-Ho with Hicks and before driving to the Fosters', the pair drove around for awhile before stopping at Vinnie's Tavern in Fort Madison. Hicks did not know of the Vincents' testimony until after the homicide trial when the postconviction hearing was held. He asserts that their testimony casts doubt on Lawrence's credibility and suggests that Willie Jefferson was with Lawrence.

The facts relating to the Vincents' testimony follow. At trial Lawrence testified he went to the door and purchased some pork rinds. At the postconviction hearing Val Vincent testified that a black man came to the door about five minutes before 2:00 a. m. to purchase pork rinds. He stated the man drove away in a car matching the description of Lawrence's vehicle. Vincent also testified he noticed another person

in the front seat of the vehicle. His testimony supports Lawrence's story.

Lawrence also testified that shortly after leaving Vinnie's, Hicks got out of the car and said he was going back to Vinnie's. In the meantime Earl Vincent, Val's father, came to work at Vinnie's. Earl Vincent testified at the postconviction hearing that within five minutes after 2:00 a. m. a man came to the door. Vincent stated:

Q. And would you identify or describe that person, please? A. Well, to my recollection, as I told you, I seen him briefly through a narrow piece of glass, and the vestibule was dark in there; and I would say he was—to my recollection, he was more or less light-complected Negro, and approximately six feet tall.

Q. Would you say six feet or more, or six feet or less? A. Well, I had to look up at him to see him through the door.

Q. Is there anything else about him you can tell us—hair or shirt or anything? A. Well, I watched him walk across the street and get into his car on the driver's side; and he took off east, and—but I couldn't tell you how he was dressed or anything else.

. . . .

Q. Do you know Gentric Hicks? A. Who?

Q. Gentric Hicks? A. No, I don't.

Q. He is the gentleman sitting to my left. Is this the man that was at your door that night? A. As I say, I only seen him for two or three seconds through the glass, but to—I don't believe he is.

Q. Why do you say that? A. Well, because he doesn't—when I seen him walk in the hallway, he didn't appear to be tall enough.

On cross-examination Vincent testified:

Q. Mr. Vincent, do you remember very much that evening? A. All I remember is the man coming to the door and me telling him that I was closed.

Earl Vincent's testimony does not necessitate a new trial. Several officers testified at the postconviction hearing regarding conversations with Earl Vincent shortly after the crime. Sgt. Carle testified he talked with the Vincents within several hours of the crime. He stated that nothing was said about a second visitor. Deputy Taft and Sam Swaim talked with Earl Vincent the day after the crime. Taft's report stated that Earl Vincent was "[u]nable to give any usable information other than that his son had mentioned." Swaim stated that Vincent told him of the second man, "The only thing he identified the subject as being a black male." Also, "Earl Vincent, when I talked to him, was very, very vague and had a hard time remembering a lot of things." At best, Earl Vincent's testimony might have been useful for impeachment, but given the officers' testimony and the fact that Earl Vincent admits he only saw the man for a few seconds in poor light we doubt his testimony would be significantly material.

Hicks also claims a report prepared by Deputy Duffy satisfies the newly discovered evidence requirements for a new trial. Duffy took rough notes during an interview with the Fosters; he used these notes to write a report which contained a description of the events surrounding the robbery. Hicks claims the report was material because it contained no description of the robber and also it indicates Mrs. Foster may have been confused as to the door by which the robber departed.

With regard to the robber's description, Mrs. Foster relayed identification information to other investigators both before and after this report—thus the failure to mention any identifying features (or Duffy's failure to write down any features mentioned) does not indicate Mrs. Foster could not identify the robber. Furthermore, Duffy stated at the hearing that he did not attempt to elicit an exact description of the robber, nor did he attempt to go into detail. This piece of evidence is insufficient for newly discovered evidence purposes.

As to Hicks' contention that the report shows Mrs. Foster may have been confused about the door by which Hicks departed from the motel, Hicks urges materiality be-

cause fingerprints were found near a back door. We note, however, that Mr. and Mrs. Foster told other investigators that the robber left through the back kitchen door, not the side door as the report suggests; Mrs. Foster told investigators the robber was confused as to the door by which to leave, suggesting Duffy may have reported her interview incorrectly. Finally, the robber's hat was found outside a back porch door, thus supporting Mrs. Foster's trial statement. Again the evidence appears insufficient for newly discovered evidence purposes.

Hicks makes other contentions regarding newly discovered evidence. He urges a new trial is required on the basis of evidence of Sgt. Carle. At trial Mrs. Foster testified the robber's hat flew off at the time of the shooting, shortly before the robber fled. She testified she then saw Hicks' forehead and hair. After trial the defense discovered that Sgt. Carle had found the hat outside a back porch door, suggesting that the hat did not come off inside. According to the evidence, Mrs. Foster had ample opportunity before this time to observe the robber's features. Again the evidence is insufficient for newly discovered evidence purposes.

Finally, Hicks asserts materiality in a newly discovered page of a report prepared by Sheriff Arnold. The report stated: "We put together seven photographs and # 1. Correction the subject, Mr. Hicks was picked out by Mr. Lawrence, this can be testified to by Mr. Swaim and I think Deputy Taft, also the seven pictures were taken and shown to Mrs. Foster and Mr. Foster."

Hicks argues this statement indicates that eight rather than seven pictures were shown to Mrs. Foster and that two photographs of him were in the array. The police had one black-and-white and one color photograph in their possession; he suggests that both photographs were shown to Mrs. Foster. Everyone involved, however, testified that Mrs. Foster was shown only black-and-white photographs. Further, Mrs. Foster stated that after she chose Hicks' picture, she chose a profile, and neither of the photographs is a profile.

The newly discovered evidence was impeaching, and it would probably not change the jury's verdict. It was of the kind which can usually be gathered by a close review at the conclusion of a hard-fought trial. The trial court rightly denied the motion.

 VIII. *Exculpatory Evidence.* Hicks further contends that a new trial is required because the State failed to produce material exculpatory evidence which existed. The defense made a general request for "*Brady* material"; the State apparently agreed to provide exculpatory material.

Hicks suggests that several reports, especially Deputy Duffy's statement of an interview with the Fosters, should have been turned over to the defense. He asserts this report was material because it did not contain a description of the robber and because it indicated Mrs. Foster may have been confused about the door by which the robber departed. We have already reviewed this report.

The landmark case in this area is *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963): "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." We stated in *State v. Hall,* 249 N.W.2d 843, 846 (Iowa), *cert. denied,* 434 U.S. 822, 98 S.Ct. 66, 54 L.Ed.2d 79 (1977), "To constitute a due process violation under *Brady v. Maryland* . . . the suppressed information must be material either to the guilt or punishment of the defendant, not merely potentially or inferentially helpful to the defense."

The law relating to exculpatory evidence is set forth in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *State v. Hall.* Defendant's request for *Brady* material was general, and this is not a case "in which the information is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to

produce." *State v. Hall,* 249 N.W.2d at 847. Hicks is correct that the standard to be employed in this case is whether " 'the omitted evidence creates a reasonable doubt that did not otherwise exist.' " *State v. Hall,* 249 N.W.2d at 847 (quoting *Agurs* ). We hold that the reports would have been only inferentially helpful and do not create a reasonable doubt that did not otherwise exist. The trial court did not err in overruling Hicks' motion for new trial.

IX. *Interests of Justice.* Finally, Hicks asserts his trial was more than an imperfect one; it was unfair. Our review of the record convinces us that this assertion is not tenable. He also asserts that Mrs. Foster attempted to give the impression her son was shot in cold blood. The record does not substantiate this claim. A fair reading of her testimony indicates that her son and the robber got into a scuffle and her son tried to get the gun away.

Hicks was well and vigorously defended—and prosecuted. The issues for determination were for the jury, which has spoken.

AFFIRMED.