# IN THE SUPREME COURT OF IOWA

No. 13–0224

Filed February 6, 2015

Amended April 20, 2015

**STATE OF IOWA,**

    Appellee,

vs.

**ROBERT LYNN VAUGHAN,**

    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Lee County, John M. Wright, Judge.

The State seeks further review of a court of appeals decision reversing the defendant's first-degree arson conviction and remanding for a new trial based on pretrial counsel's conflict of interest. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Mark D. Fisher of Nidey Erdahl Tindal & Fisher, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Heather Mapes and Kevin Cmelik, Assistant Attorneys General, Michael P. Short, County Attorney, and Clinton R. Boddicker, Assistant County Attorney, for appellee.

**MANSFIELD, Justice.**

In this case, we are asked to determine whether a new trial is required when the district court replaces a conflicted defense attorney with a conflict-free attorney more than three months before trial, and there is no showing that the previous conflict had ongoing adverse effects on the representation. We conclude a new trial is not required in these circumstances. For this reason, we affirm the district court's judgment of conviction and sentence. We also vacate the decision of the court of appeals ordering a new trial.

### I. Background Facts and Proceedings.

Around 2:30 a.m. on October 20, 2011, police and firefighters responded to a report of a fire at 2902 Avenue M in Fort Madison. When officers arrived, a detached garage at that address was fully engulfed in flames. Robert Vaughan and his mother, Marcia Lawson, both of whom lived at 2902 Avenue M, were outside the home. Their house is approximately thirty feet from the detached garage.

Vaughan and Lawson kept a number of dogs on their property, who were normally caged in a kennel next to the garage. However, when police and firefighters showed up, these dogs were either free in the yard or secured inside a vehicle. Vaughan later claimed they had been locked in the kennel for the night but had escaped during the fire. Neighbors disputed this, stating that they had noticed the dogs—unusually—were not in their kennel that evening. Also, although Vaughan and his mother's vehicles were normally parked next to the garage, on the night of the fire they were parked elsewhere on the property away from the garage.

As firefighters worked to extinguish the garage fire and keep it from spreading, one firefighter, Jared Siefken, noticed a glow coming from a

window on the south side of the house itself. Siefken looked into the window and saw a small fire burning. He broke the window and used a hose on the fire. Siefken and another firefighter then entered the house to confirm the interior fire had been extinguished. They spotted a clear plastic bag full of various medications placed on a chair by the front door of the house. Vaughan later acknowledged he takes a number of daily medications.

The interior house fire was contained within a computer room at the back of the house. Firefighters also succeeded in putting out the garage fire, but that structure collapsed from the damage the blaze had inflicted.

After ensuring the fires were no longer a hazard, the fire chief summoned a special agent from the division of the state fire marshal to the scene. The special agent concluded that the fire in the computer room appeared to have two separate points of origin, neither of which was related to the garage fire. He also came upon what he believed to be pieces of a broken "Molotov cocktail," or an improvised incendiary device comprised of a glass bottleneck and a cloth "wick." An investigation later found gasoline on the bottleneck, the wick, and the nearby carpet.

It also turned out that Vaughan had put a number of items up for sale the day before the fires, including a four-wheeler, a golf cart, and a lawn mower. In addition, Vaughan had arranged for a boat belonging to a third party to be moved from 2902 Avenue M to a different property. Vaughan later said he did this because his mother wanted the boat moved off the property so the weeds could be cleared out before the winter.

Vaughan's mother, who owned the house, submitted an insurance claim approximately eight weeks after the fires. In addition to seeking

compensation for building damage, Lawson claimed about $25,000 in personal property losses, representing property that she or Vaughan had owned that was destroyed in the fires. The personal property itemization took up six pages of the claim.

The insurance company hired an electrical engineering expert who investigated the scene of the fires and determined neither the house fire nor the garage fire had an electrical cause. The insurance company also examined Vaughan under oath in connection with the claim. The insurance company subsequently denied the insurance claim.

On February 24, 2012, the State charged Vaughan with arson in the first degree. *See* Iowa Code §§ 712.1(1), .2 (2011). The court appointed W. Jon Henson, an assistant public defender, to represent Vaughan.

On March 25, Henson was also appointed to represent George Cline, Jr., in an unrelated case. Cline pled guilty in his case on May 31 and was sentenced on June 1.

On May 31, Henson and Cline were meeting before Cline's plea hearing. Henson mentioned that he was preparing for Vaughan's trial. Cline told Henson he wanted to speak to the prosecutor about Vaughan. Cline did not disclose to Henson the information he had about Vaughan. Henson relayed Cline's request by telephone to the prosecutor.[1]

---

[1]Cline later asserted that he believed he had asked Henson to put him in contact with law enforcement regarding Vaughan in March 2012, not on May 31, 2012, although he was not certain. Cline also later claimed he specifically told Henson in this conversation that Vaughan had tried to hire him (Cline) to set the fire, although at another point in his testimony he stated only that he told Henson he knew Vaughan.

Henson denied that he spoke to Cline about Vaughan before May 31 and denied that Cline told him anything specific about Vaughan. The prosecutor confirmed that he did not hear from Henson until early June, and that Henson merely told him Cline wanted to speak to law enforcement about Vaughan. The district court found Henson's version of events more credible than Cline's and so do we.

On August 7, a police investigator and a representative from the fire marshal's office met with Cline. Cline gave a statement in which he claimed Vaughan had asked him, prior to the October 20, 2011 blaze, to start a fire on Vaughan's property in return for a third of the insurance recovery. Cline also claimed to have observed Vaughan making an inventory of the items in the garage, supposedly for the purpose of committing insurance fraud.

On August 15, 2012, the State listed Cline as a witness in Vaughan's case. On August 22, Henson filed a motion to withdraw from representing Vaughan on behalf of the public defender's office, indicating that office had a conflict of interest due to the fact it represented a witness against Vaughan. The court granted Henson's motion to withdraw without a hearing and appointed Gordon Liles to represent Vaughan that same day.

Henson had taken a number of depositions before withdrawing. Liles took additional depositions and filed a number of motions. Indeed, by October 18, Liles had filed an application to exceed fee guidelines stating he had already spent 45.7 hours on the case. On December 14, shortly before trial, Liles filed a further application stating that he had spent a total of 101 hours in pretrial preparation on the Vaughan case.

Vaughan's trial took place over three days from December 17 to December 19. Various police officers, firefighters, and neighbors testified for the State, as did the special agent of the state fire marshal, a Division of Criminal Investigation criminalist, and the insurance company's investigator and electrical engineer. The State also introduced into evidence an edited version of Vaughan's sworn statement to the insurance company.

In addition, the State called Cline. According to Cline's testimony, he had known Vaughan since 2008. Sometime in August 2011, Cline was at Vaughan and Lawson's house while Vaughan was making an inventory of his belongings. Vaughan asked Cline if he was interested in making some money and whether he would be interested in starting a fire for him. Cline said he laughed off the proposal at the time.

Cline explained that he was still in jail for contempt of court and absence from custody at a halfway house at the time of his testimony. He also stated he had asked to speak to law enforcement about Vaughan because he "wasn't going to lie about it," and not in exchange for favorable treatment by the prosecution.

In cross-examining Cline, Vaughan's attorney Liles went over Cline's extensive criminal history. This history included convictions for assault with a dangerous weapon; operating while intoxicated and possession of illegal drugs; possession of drugs, second offense; going armed; possession of precursors with the intent to manufacture methamphetamine; absence from custody; criminal mischief; and seven separate convictions for driving while barred. Cline acknowledged on cross-examination he had forty-eight criminal convictions and had been to prison six separate times. Cline also admitted he did not try to tell anyone in law enforcement about his conversations with Vaughan until months after the fires occurred. Vaughan's attorney further established that while absent from custody, Cline had an altercation with his girlfriend and attempted to kill himself. Finally, Cline admitted on cross-examination that he was aware "prosecutors can certainly do things for you."

Neither Vaughan nor Lawson testified at trial. Vaughan called two witnesses in his defense. First, a neighbor testified, contrary to the

testimony of other neighbors, that Vaughan's vehicles had no typical parking spot either near or away from the garage. Second, an Iowa Department of Human Services case manager testified that Vaughan was partially disabled, needed a walker to get around, and took numerous medications due to injuries he had suffered in a 2001 car accident.

The jury found Vaughan guilty of first-degree arson as charged. Vaughan filed posttrial motions in arrest of judgment and for a new trial. He alleged, among other things, the verdict was contrary to law and evidence. Vaughan also included a claim that his prior counsel, Henson, had operated under a conflict of interest due to his representation of Cline, a prosecution witness. The trial court held a hearing on the combined motions and denied them both on January 22, 2013.

Vaughan appealed his conviction to this court. His appeal raised two grounds—insufficiency of evidence and that his pretrial counsel had an impermissible conflict of interest. On these bases, he requested a judgment of acquittal, or, alternatively, a new trial. We transferred the case to the court of appeals.

The court of appeals issued an opinion determining there was sufficient evidence to support the arson charge, but holding that Henson's conflict of interest required reversal of Vaughan's conviction. The court concluded that Henson was under an actual conflict of interest from the time Cline indicated he wanted to speak to the prosecutor about Vaughan until Henson withdrew, or from approximately May 31 until August 22, 2012. The court presumed this conflict to be prejudicial:

> Here, Vaughan's first attorney was laboring under an actual conflict at the time the depositions of material witnesses, including the lead investigator, were taken. The attorney's torn allegiance during a critical stage of pretrial proceedings constitutes circumstances of such magnitude allowing us to presume prejudice. . . .

. . . .

> The length of time over which counsel had an actual conflict, in addition to taking depositions of material witnesses when counsel's allegiance was divided, allows us to presume prejudice. We therefore reverse and remand for a new trial with conflict-free counsel.

One judge dissented from the court of appeals' opinion, believing the majority had misapplied established law regarding the right to counsel. In the dissent's view, the trial court's decision to permit Henson to withdraw and replace him with conflict-free counsel remedied any conflict of interest. As the dissent put it,

> The conclusion that no further relief is available is demonstrated by the relief the majority orders in this case: Vaughan's conviction should be vacated and this matter remanded for trial with conflict-free counsel. But isn't that what just occurred?

We granted the State's application for further review.

## II. Standard of Review.

As we have recently explained,

> We review a sufficiency-of-evidence claim for correction of errors at law. The court considers all the evidence presented at trial and views the evidence in the light most favorable to the state. The verdict is supported by substantial evidence when the evidence could convince a rational trier of fact the defendant is guilty beyond a reasonable doubt.

*State v. Copenhaver*, 844 N.W.2d 442, 449 (Iowa 2014) (citations omitted). "In assessing the sufficiency of the evidence, we find circumstantial evidence equally as probative as direct." *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011).

We review conflict-of-interest allegations de novo. *State v. Smitherman*, 733 N.W.2d 341, 345 (Iowa 2007).

### III.  Sufficiency of the Evidence.

Vaughan claims there is insufficient evidence to support his conviction for first-degree arson.  To obtain this conviction, the State was required to prove beyond a reasonable doubt that Vaughan "caus[ed] a fire or explosion . . . in or near any property with the intent to destroy or damage such property, or with the knowledge that such property [would] probably be destroyed or damaged" and that "the presence of one or more persons [could] be reasonably anticipated in or near the property which is the subject of the arson."  Iowa Code §§ 712.1(1), .2.

Vaughan's allegations of insufficiency stem primarily from his assertion that the State's evidence "did not directly implicate" him in the fire.  However, circumstantial evidence can be as probative as direct evidence.  *Meyers*, 799 N.W.2d at 138.  In fact, we have previously stated, "Arson is a criminal charge which often must be proved by circumstantial evidence, since there are seldom witnesses to the crime." *State v. Veverka*, 271 N.W.2d 744, 747 (Iowa 1978).  For example, in *Veverka*, we upheld the defendant's felony murder conviction when we determined there was sufficient evidence to establish the predicate crime of arson.  *Id.* at 747–48.  The state produced evidence of two separate fires started at the crime scene, as well as proof of the use of an accelerant.  *Id.* at 747.  The defendant contended the fire was an accident.  *Id.*  We stated, "The jury was at liberty to reject defendant's version that he started the fire accidentally and to infer from the other circumstantial evidence that he 'willfully and maliciously' caused the building to be burned . . . ."  *Id.* at 748.

The circumstantial evidence in the present case was substantial. There is little doubt the fires were intentionally set.  They started on the same property at approximately the same time, but had distinct points of

origin. The remnants of a Molotov cocktail were found. An accidental cause—namely electrical malfunction—was ruled out.

The evidence connecting Vaughan to the conflagration was also substantial. Vaughan had sold several items of property and moved a boat he did not own off the property less than twenty-four hours before the fires began. Likewise, the family's dogs and vehicles were moved out of harm's way. Medications, presumably belonging to Vaughan, had been placed in a neat plastic bag at the front of the house, away from the areas where the fires began. Vaughan had a financial motive to commit the arson, and the version of events given in his sworn statement was contradicted by a number of trial witnesses. Even without taking into account Cline's trial testimony, the evidence implicating Vaughan in the crime was considerable.

There was also substantial evidence that the presence of one or more persons could have been reasonably anticipated in or near the property that was set on fire, thus supporting the jury finding that Vaughan was guilty of arson in the first degree. *See* Iowa Code § 712.2. Vaughan's mother Lawson was in the home at 2902 Avenue M when the fires were started. Also, just eighteen feet to the east stood a neighbor's house. The neighbor was in her bed at the time the fires ignited, which could have been readily anticipated by Vaughan. For these reasons, we reject Vaughan's claim of insufficient evidence.[2]

---

[2]Vaughan also notes that the jury recessed for deliberations at 4:50 p.m. on December 19 and reached a verdict by 5:58 p.m., just one hour and eight minutes later. Vaughan asserts that the jurors were "under pressure due to weather concerns." However, the record reflects that when the district court gave the case to the jury, it handled the weather concerns appropriately. The court advised the jurors, "[L]et [the court attendant] know whether you want to stay longer to deliberate, or whether you want to go home. If one of you wants to go home, the jury will go home until tomorrow morning."

**IV. Conflict of Interest.**

Vaughan next alleges his pretrial counsel, Henson, labored under an impermissible conflict of interest that requires us to grant a new trial. As we have noted above, Cline told Henson on May 31, 2012, that he wanted to talk to the prosecutor about Vaughan. Henson passed along the message but continued working on Vaughan's case until Cline was listed as a prosecution witness. At that point, Henson moved to withdraw and was replaced by conflict-free counsel (Liles) on August 22. Vaughan's trial did not begin until December 17.

**A. Relevant Caselaw.** In the late 1970s and early 1980s, the United States Supreme Court decided a trio of conflict-of-interest cases that provided the initial guidance for when courts can presume prejudice from allegedly conflicted representation. In *Holloway v. Arkansas*, the trial court disregarded a public defender's claim that his concurrent representation of three codefendants created a conflict of interest. 435 U.S. 475, 476–77, 98 S. Ct. 1173, 1175, 55 L. Ed. 2d 426, 429–30 (1978). That Court held that "whenever a trial court improperly requires joint representation over timely objection[,] reversal is automatic." *Id.* at 488, 98 S. Ct. at 1181, 55 L. Ed. 2d at 437. In *Cuyler v. Sullivan*, in contrast, neither the codefendants nor their joint attorneys raised the issue of a conflict of interest and the trial court had no reason to know of the conflict. *See* 446 U.S. 335, 337–38, 100 S. Ct. 1708, 1712, 64 L. Ed. 2d 333, 339–40 (1980). In that situation, the Court found the trial court had no duty to inquire into the possibility of a conflict, and the defendant challenging his conviction on appeal was required to show an actual conflict existed. *Id.* at 346–47, 100 S. Ct. at 1717–18, 64 L. Ed. 2d at 345–46. Finally, in *Wood v. Georgia*, the Court raised the issue of a conflict of interest sua sponte, after granting certiorari on

another claim. *See* 450 U.S. 261, 262–63, 101 S. Ct. 1097, 1099, 67 L. Ed. 2d 220, 225 (1981). The Court indicated the record was not complete enough for it to determine whether a conflict of interest existed, but remanded for the lower court to determine whether it did. *Id.* at 267–68, 273, 101 S. Ct. at 1101–02, 1104, 67 L. Ed. 2d at 227–28, 231. The Court stated, "*Sullivan mandates* a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'" *Id.* at 272 n.18, 101 S. Ct. at 1104 n.18, 67 L. Ed. 2d at 231 n.18 (quoting *Cuyler*, 446 U.S. at 347, 100 S. Ct. at 1717, 64 L. Ed. 2d at 346).

These cases, therefore, seemed to imply that reversal should be automatic whenever a trial court fails to inquire into a known conflict. *See* 3 Wayne R. LaFave et al., *Criminal Procedure* § 11.9(b), at 885 (3d ed. 2007) ("*Holloway* had spoken of an automatic reversal following simply from a violation of the duty to inquire, and the *Wood* description of *Cuyler* similarly spoke of a per se reversal requirement." (Footnotes omitted)). Based largely on this Supreme Court precedent, in *State v. Watson* we concluded that "where the trial court knew or should have known of a particular conflict, reversal is required without a showing that the conflict adversely affected counsel's performance, even though no objection was made at trial." 620 N.W.2d 233, 237 (Iowa 2000).

In *Watson*, one of the defendant's attorneys had previously represented a witness for the prosecution. *Id.* at 235, 238–39. The attorney did not conduct the cross-examination of the witness in question, but it came to light at trial that the attorney had represented both the witness and the defendant. *Id.* at 234–35. Although neither the defendant nor the attorney objected to the dual representation, we nevertheless required automatic reversal because the trial court should

have known about the conflict. *Id.* at 241–42. We concluded the Sixth Amendment required the trial court in such situations to inquire sua sponte into the potential conflict. *Id.* at 234, 241–42.

After our decision in *Watson,* the United States Supreme Court further clarified its conflict-of-interest jurisprudence in *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002). *Mickens* involved a scenario similar to that in *Watson*: the attorney had represented both the defendant and his alleged victim, the court had knowledge of the potential conflict, and the court nevertheless failed to inquire into the potential conflict. *See id.* at 164–65, 122 S. Ct. at 1240, 152 L. Ed. 2d at 299–300. In opposition to our holding in *Watson* requiring automatic reversal, however, the Supreme Court concluded that even where the trial court fails to inquire into a potential conflict of which it should have been aware, the defendant still has to establish that the alleged conflict materialized into an *actual* conflict. *See id.* at 172–74, 122 S. Ct. at 1244–45, 152 L. Ed. 2d at 304–05. The Court stated a defendant demonstrates an actual conflict by showing that the conflict adversely affected his counsel's performance. *Id.* at 171, 122 S. Ct. at 1243, 152 L. Ed. 2d at 304 (clarifying the confusion over *Wood*'s interpretation by stating that "[a]s [it is] used in the remand instruction [in *Wood*], however, we think 'an actual conflict of interest' meant precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties"). Many courts have indicated that to show an adverse effect,

> the defendant must "identify a plausible alternative defense strategy or tactic that defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict."

*Noe v. United States*, 601 F.3d 784, 790 (8th Cir. 2010) (quoting *Winfield v. Roper*, 460 F.3d 1026, 1039 (8th Cir. 2006)); *accord Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006); *United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003); *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), *aff'd without consideration of this point*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291; *Perillo v. Johnson*, 205 F.3d 775, 807 (5th Cir. 2000); *United States v. Morelli*, 169 F.3d 798, 810 (3d Cir. 1999); *Freund v. Butterworth*, 165 F.3d 839, 860 (11th Cir. 1999); *State v. Moore*, 213 P.3d 150, 165 (Ariz. 2009) (en banc); *Taylor v. State*, 51 A.3d 655, 672 (Md. 2012).

Therefore, following *Mickens*, automatic reversal is required under the Sixth Amendment only when the trial court refuses to inquire into a conflict of interest over defendant's or counsel's objection. *See Holloway*, 435 U.S. at 488, 98 S. Ct. at 1181, 55 L. Ed. 2d at 437. When neither the defendant nor his or her attorney raises the conflict of interest, the defendant is required to show an adverse effect on counsel's performance to warrant reversal, even if the trial court should have known about the conflict and failed to inquire. *See Mickens*, 535 U.S. at 172–74, 122 S. Ct. at 1244–45, 152 L. Ed. 2d at 304–05.

Most recently in Iowa, we decided *Smitherman*. *See* 733 N.W.2d at 341. In that case, a public defender represented both the defendant and an individual who later came forth as a witness for the state. *Id.* at 343. The public defender withdrew from representing the witness and the public defender's office replaced the specific attorney and screened him from working on the defendant's case as well. *Id.* at 343–44. At a hearing on the conflict, the court determined the public defender's office's continued representation of the defendant did not create an impermissible conflict of interest. *Id.* at 345. The defendant did not

object to the representation at the time, but alleged on appeal that his state and federal constitutional rights had been violated by the public defender's office's simultaneous representation of himself and the witness. *Id.* at 344–45. We determined that because the court had inquired into the conflict, Smitherman was required to show an adverse effect on counsel's performance in order to prevail on his conflict-of-interest claim. *See id.* at 347. We additionally recognized that "our holding in *Watson* under the Sixth Amendment is impacted by the Supreme Court's decision in *Mickens*," but declined to determine if it had been overruled or whether it survived on state constitutional grounds. *Id.*

**B. The Conflict in the Present Case.** Vaughan argues Henson's simultaneous representation of Cline and Vaughan from May to August 2012 resulted in an impermissible conflict of interest. As the court of appeals put it, "During discovery, depositions, and conferences with Vaughan, counsel knew another client was giving information about Vaughan to the State." The State disputes this view, agreeing with Henson that there was no actual conflict until Henson knew Vaughan was going to be a State's witness. We need not decide whether an actual conflict existed before that time because we find that the appointment of conflict-free counsel nearly four months before trial under the circumstances of this case remedied any potential conflict, actual or otherwise.

Vaughan asserts the absence of a formal *Watson* hearing in the present case requires reversal. However, suppose Henson had *not* recognized that he had a conflict on August 15, 2012, and instead either the State had sought or the district court acting sua sponte had ordered a *Watson* hearing. Following that hearing, presumably, Henson would

have been disqualified and new counsel would have been appointed. Yet that is exactly what happened here. In short, the absence of a *Watson* hearing seems beside the point when the defendant received *Watson* relief.

This case, therefore, is more akin to *Smitherman*, where the defendant alleged on appeal that his federal and state constitutional rights to counsel were violated, despite the fact the trial court *did* conduct a *Watson* hearing and inquired into the conflict. *See* 733 N.W.2d at 345, 347. When a *Watson* hearing occurs, *Smitherman* requires the defendant demonstrate an adverse effect on counsel's performance resulting from an actual conflict of interest; reversal is not automatic. *Id.* at 347–48. Although the court here did not inquire into the conflict, it afforded the same relief that would have resulted from an inquiry, namely, replacement of Vaughan's attorney with conflict-free counsel.

Hence, as in *Smitherman*, Vaughan must demonstrate that the conflict had an adverse effect on counsel's performance to warrant a new trial. *See id.* at 347. As stated above, an adverse effect occurs when counsel fails to pursue a plausible strategy or tactic due to the existence of a conflict of interest. *Noe*, 601 F.3d at 790. Vaughan has not met this burden. The record shows that he had conflict-free counsel not only throughout his trial but for the preceding three and one-half months. His new counsel aggressively cross-examined Cline at trial, covering even the dubiously relevant subject of whether Cline had recently had an altercation with his girlfriend. It is true, as the court of appeals observed, that some depositions (not Cline's) were taken by Henson before he withdrew from the case. But Vaughan does not offer a single example of a question that should have been asked in one of those

depositions and was not. When Liles took over in late August, he could have sought to redepose previously deposed witnesses. As it was, the record shows he conducted additional depositions and devoted over one hundred hours to his own pretrial preparation.

It is undisputed that Vaughan received conflict-free counsel well before trial. Thus, even assuming his prior counsel labored under an actual conflict, Vaughan must show that this arrangement was somehow insufficient to cure the prior conflict. He has not done that. As the dissenter on the court of appeals pointed out, the relief Vaughan seeks on appeal is essentially the relief he received from the district court—namely, a trial with conflict-free counsel. So how have his constitutional rights to counsel been violated?

Other courts have held that the replacement of counsel well in advance of trial generally remedies a pretrial conflict of interest. *See, e.g.*, *United States v. Pascarella*, 84 F.3d 61, 67 (2d Cir. 1996). In the *Pascarella* case, a single attorney (Gilroy) originally represented both the defendant and a codefendant. *Id.* at 65. Six months before trial, Gilroy was replaced by a different lawyer, Lamb. *Id.* On appeal, the defendant argued that Gilroy's pretrial conflict of interest required reversal of his conviction. *Id.* at 67. The United States Court of Appeals for the Second Circuit disagreed, stating, "The replacement of Gilroy by Lamb as Pascarella's lawyer mooted any question regarding the propriety of Gilroy's representation of Pascarella." *Id.* Along similar lines, the Indiana Supreme Court rejected a conflict-of-interest claim in a murder case. *See Woods v. State*, 701 N.E.2d 1208, 1210, 1223–24 (Ind. 1998). There the allegedly conflicted attorney, who had previously represented the defendant's mother, was allowed to withdraw four months before trial

without a recorded hearing. *Id.* at 1222. As the court explained in overruling the defendant's arguments,

> Woods would have us overlook the fact that Rhetts withdrew nearly four months before trial. This is a critical point. Because successor counsel Wharry and Johnston planned and executed their defense strategy after their own discovery, pretrial motions, and consultations with Woods, any claim that Rhetts' inaction likely affected their performance—or, for that matter, the fairness of the trial—requires more than a bald allegation. Woods in effect asks us to presume ineffectiveness and an unfair trial where initial trial counsel withdraws due to a conflict. There is no such presumption.

*Id.* at 1224*; see also Newton v. United States*, Nos. 3:13–CV–2488–D, 3:10–CR–304–D, 2014 WL 1294873, at *3 (N.D. Tex. Mar. 31, 2014) (finding no adverse effect where an attorney represented the defendant and his codefendant for five months before trial, but the defendant had conflict-free counsel for trial); *Day v. United States*, No. 7:07-cv-00376, 2008 WL 222316, at *6 (W.D. Va. Jan. 25, 2008) (rejecting conflict-of-interest claim where the conflicted counsel was replaced a year before trial and the defendant "does not demonstrate, or even allege, that [prior counsel's] actions prevented subsequent counsel from investigating the case"), *appeal dismissed*, 285 Fed. Appx. 66 (4th Cir. 2008); *Pruitt v. State*, 514 S.E.2d 639, 648 (Ga. 1999) (rejecting conflict-of-interest claim based on the "obvious conflict" arising out of an attorney's simultaneous representation of "the district attorney seeking the death penalty against the defendant" based on the fact that this attorney was replaced six months before trial); *State v. Cummings*, 721 P.2d 545, 547 (Wash. Ct. App. 1986) (holding that the defendant's initial sharing of counsel with a codefendant did not require a new trial where substitute counsel was appointed for the defendant a month before trial and the defendant "points to nothing but the original conflict as error").

Finally, although it predates the more recent conflict-of-interest jurisprudence discussed above, we think it is also worth mentioning our decision in *State v. Hicks*. *See* 277 N.W.2d 889 (Iowa 1979). There, the defendant argued among other things that his original attorney "was inexperienced and had conflicts of interest." *Id.* at 896. We rejected that claim, noting,

> Hicks' claims do not add up to ineffective representation. Hicks was represented for over two months before trial and at trial by experienced, independent counsel; any conflicts of interest vanished once new counsel was appointed. The record shows the first attorney requested reports and deposed the main witnesses. Hicks' present counsel deposed the three witnesses that the defendant now complains should have been deposed by his first attorney. Present counsel had two months to conduct additional discovery and to prepare the case in accordance with Hicks' wishes.

*Id.*

In the concluding paragraphs of both his opening brief and his reply brief, Vaughan makes the summary assertion that he is entitled to a new trial "without the testimony of . . . Cline." However, he presents no argument in support of his contention that Henson's conflict should preclude the State from being permitted to call Cline. He also cites no authority. The court of appeals found the issue waived for purposes of this appeal and so do we. *See* Iowa R. App. P. 6.903(2)(*g*)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue.").

### V. Conclusion.

For the foregoing reasons, we affirm Vaughan's conviction for first-degree arson.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Appel and Hecht, JJ., who concur specially.

**APPEL, Justice (concurring specially).**

I concur with the result and most of the court's opinion; however, I think the court's opinion misses an important aspect of this case.

To me, it is astonishing that a lawyer representing an accused in a criminal matter would facilitate the discovery of evidence by the prosecution adverse to his or her client. Yet, this is precisely what occurred here. When Vaughan's attorney learned from Cline that Cline wanted to speak to the prosecutor about Vaughan, it was obvious Cline did not intend to assist in Vaughan's defense. At that point, Vaughan's attorney should have refused to contact the prosecutor on behalf of Cline. Instead, he facilitated the prosecution's receipt of evidence adverse to his client. When he did so, he was not acting zealously on behalf of Vaughan. It was a disloyal act.

Loyalty to one's client is "perhaps the most basic of counsel's duties" and is paramount to our system of criminal justice. *See Strickland v. Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674, 696 (1984). As one court noted,

> The duty of loyalty is so essential to the proper functioning of the judicial system that its faithful discharge is mandated not only by the Rules of Professional Conduct, but also, in criminal cases, by the Sixth Amendment right of a criminal defendant to the effective assistance of counsel.

*State v. Holland*, 876 P.2d 357, 359 (Utah 1994). The *Holland* court further explained "[t]he faithful discharge of that duty is a vital factor both in uncovering and making clear to a court the truth on which a just decision depends and in protecting the rights of persons charged with a crime." *Id.*; *see also Von Moltke v. Gillies*, 332 U.S. 708, 725–26, 68 S. Ct. 316, 324, 92 L. Ed. 309, 331–32 (1948) (plurality opinion) ("The

right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client. . . . Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer."); *Simmons v. State Pub. Defender*, 791 N.W.2d 69, 75 (Iowa 2010) (noting "criminal defendants . . . are entitled to a real, zealous advocate who will fiercely seek to protect their interests").

Our standards of professional conduct similarly describe a lawyer's duty of loyalty as "essential," "undivided," "complete," "total," "entire," and "vital." *See* Iowa R. Prof'l Conduct 32:1.7 cmt. 1 (noting loyalty is an "essential element[]" in the lawyer's relationship with a client); Restatement (Third) of the Law Governing Lawyers § 16 cmt. b, at 146, § 121 cmt. b, at 245 (2000) (stating "the law seeks to assure clients that their lawyers will represent them with undivided loyalty"); ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-3.5(e) & 4-3.5 cmt., at 162–64 (3d ed. 1993) (noting "[t]he basic rule that must guide every lawyer is that the lawyer's total loyalty is due each client in each case" and that "[a] lawyer for an accused must give . . . complete loyalty").

Even so, I do not believe that the evidence was subject to per se exclusion because of his counsel's disloyalty. Even viewing the facts most favorably to Vaughan, the State would be entitled to admission of the evidence if it could meet its burden under *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). In that case, the state obtained information from a defendant regarding the location of a victim's body in violation of the defendant's right to counsel. *Id.* at 435–37, 104 S. Ct. at 2504–05, 81 L. Ed. 2d at 382–83. The fact the state actually learned of the body's location in violation of the defendant's right

to counsel, however, did not mean the evidence could never be used by the state. *Id.* at 437–38, 104 S. Ct. at 2506, 81 L. Ed. 2d at 383–84. Instead, when challenged, the state was entitled to show the evidence either would have been inevitably discovered or there was an independent, untainted source of the evidence. *Id.* at 443–48, 104 S. Ct. at 2508–11, 81 L. Ed. 2d at 387–90.

In my view, the record thus presents a possible ineffective-assistance claim. Vaughan's new counsel could have sought to exclude the testimony of Cline on the ground that the evidence was discovered through an improper communication between his previous attorney and the prosecutor. He did not do so. Whether the failure to object to the admission of the evidence amounted to ineffective assistance of counsel is not presently before the court.

Hecht, J., joins this special concurrence.