# IN THE COURT OF APPEALS OF IOWA

No. 23-1646
Filed September 18, 2024

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**MICHAEL CRAIG GLYNN,**
      Defendant-Appellant.
_____

Appeal from the Iowa District Court for Boone County, John R. Flynn, Judge.

Michael Glynn appeals his convictions for first-degree arson, possession of ammunition by a prohibited person, and third-degree burglary. **AFFIRMED.**

Katherine R.J. Scott of New Point Law Firm, PLC, Ames, for appellant.

Brenna Bird, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Considered by Schumacher, P.J., and Buller and Langholz, JJ.

**SCHUMACHER, Presiding Judge.**

Michael Glynn appeals his convictions for first-degree arson, possession of ammunition by a prohibited person, and third-degree burglary. He challenges the district court's denial of his motion to change venue and the sufficiency of the evidence supporting his convictions. Upon our review, we affirm.

## I.      Background Facts and Prior Proceedings

In 2013, P.M. met Michael Glynn. Their relationship became romantic, and within two years Glynn moved into P.M.'s home. The couple married in 2020, but by January 2023, the relationship had soured. P.M. asked Glynn to move out early that year, and she filed for divorce shortly thereafter.

Glynn did not respond well to the dissolution proceedings. He threatened self-harm after P.M. asked him to move out. Despite her requests that Glynn stay away, Glynn showed up twice at P.M.'s home and physically assaulted her. Glynn's conduct became so concerning, P.M.'s adult son stayed with her as often as he could. P.M. eventually obtained a temporary no-contact order against Glynn, but the string of text messages sent to P.M. in the days after the order was granted showed a disregard for the court order.

The relationship's collapse led to the events of May 1, 2023. Early that afternoon, a neighbor who was aware of the no-contact order saw Glynn walking up P.M.'s driveway toward the house. P.M. was not home at the time. The neighbor called P.M.'s son, who in turn called law enforcement. Officers responded to the property soon after. As they approached the home, they observed Glynn inside the residence. The officers backed up and established a perimeter.

Officers made phone contact with Glynn, but he refused to leave the home. He threatened to blow up the house, said he intended to die alone in the home because of the home's significance to P.M., and began breaking windows. Roughly an hour after officers first arrived on the scene, a burning box that officers believed contained shotgun ammunition was tossed out a window of the home. Within minutes, officers observed smoke billowing from the home. Officers apprehended Glynn as he ran from P.M.'s burning home.

Although firefighters managed to put out the blaze, the damage to the home was extensive, and P.M.'s garage partially collapsed. And after the wind fanned the fire to a neighbor's property, the neighbor's garage burned and was a total loss. The physical evidence that remained was too damaged for the fire marshal to determine the cause of the fire.

The State charged Glynn in Boone County—where P.M.'s home was located. Glynn moved to change venue two weeks before the start of trial, claiming an impartial jury could not be seated in Boone County because of pretrial publicity and prejudice. The district court denied the motion and a jury trial commenced in July 2023. Following trial, the jury returned verdicts, finding Glynn guilty of the charges below relevant to this appeal: first-degree arson, possession of ammunition by a prohibited person, and third-degree burglary. Glynn appeals.

## II.     Change of Venue

Glynn asserts the district court improperly denied his motion to change venue. The State claims that either Glynn failed to preserve error—contending the district court's pre-trial order regarding venue change was not a final order—or, in the alternative, Glynn waived his objection to venue.

## A.    Error Preservation

Preserving an issue for appeal ordinarily requires the issue to have been first raised to and ruled on by the district court. *Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012).

The error-preservation dispute concerns whether the district court ruled on the motion to change venue. The State argues that there was no final ruling on the motion, highlighting the district court order's language of being willing to revisit the decision after voir dire. The State's position asks us to treat the venue-change ruling the same as a conditional ruling on a motion in limine.[1] Under that view, if a district court ruling that denies venue change acknowledges that jury selection may expose information persuading the court to conclude differently, error preservation would require a renewed motion after voir dire.

In opposition to the State's position, Glynn argues *State v. Robinson*, 389 N.W.2d 401 (Iowa 1986) holds that a defendant need not renew a motion to change venue after voir dire if an initial motion was made and ruled on, even when the court is willing to reconsider should future developments raise doubts over the trial's fairness. *See Robinson*, 389 N.W.2d at 402–03 (noting the district court, in its initial venue change ruling, stated it would re-examine its decision should voir dire raise concerns over the ability to provide a fair trial in that venue).

---

[1] Claims of error on evidentiary rulings are not preserved when there has been only a conditional ruling on a motion in limine. *See Quad City Bank & Tr. v. Jim Kircher & Assocs.*, 804 N.W.2d 83, 91–92 (Iowa 2011) (finding no preserved error when the appellant failed to "offer the testimony contained in the offer of proof," thus depriving the trial court the ability to make a ruling on admissibility).

In the alternative, the State cites two unreported cases by this court as the foundation for the State's argument that Glynn waived the objection by not renewing it. Neither case is sufficiently analogous to the facts before this court to persuade us to extract a rule applicable here, so we assume without deciding that Glynn preserved error on this issue and turn to the merits of Glynn's claim.

**B.      Abuse of Discretion**

Glynn argues the pretrial publicity following his arrest was so pervasive and inflammatory that the district court was obligated to presume the existence of prejudice in any jury selected from Boone County. Glynn offered a handful of local media articles to support his claim.

We apply de novo review to a district court's denial of a motion to change venue and will reverse only upon finding an abuse of discretion. *State v. Siemer*, 454 N.W.2d 857, 860 (Iowa 1990).

The existence and pervasiveness of pretrial publicity alone is insufficient to compel a court to grant a motion for venue change. *State v. Morgan*, 559 N.W.2d 603, 611 (Iowa 1997). A defendant must show either actual or presumptive prejudice arising therefrom. *Id.* Entitlement to a venue change based on a presumptive prejudice claim requires the defendant prove "that the publicity attending the case was 'pervasive and inflammatory.'" *Siemer*, 454 N.W.2d at 860 (quoting *State v. Harris*, 436 N.W.2d 364, 367 (Iowa 1989)). A court weighs the following factors when deciding whether pretrial publicity creates a presumption of prejudice for venue purposes: "the nature, tone, and accuracy of the articles; their timing in relation to the trial; and the impact of the publicity on the jurors as revealed through voir dire." *State v. Evans*, 671 N.W.2d 720, 726 (Iowa 2003); *accord*

*Siemer*, 454 N.W.2d at 860. The burden is on the defendant to show facts sufficient to raise the presumption of prejudice. *State v. Wilson*, 406 N.W.2d 442, 445 (Iowa 1987).

Glynn offered six media reports related to the events underlying his conviction and one article published months earlier reporting Glynn's prior arrest on unrelated theft charges. He contends the publicity was unfair and written to invoke emotional responses in its audience. But "the nature and tone of the reporting of these events was predominantly factual and no more sensational than the crimes alleged." *Siemer*, 454 N.W.2d at 861. In none of the reports did the media state Glynn was guilty. Although Glynn claims any reference to his past criminal conduct implied guilt in the current case, "community knowledge of a defendant's prior criminal record does not create a presumption of prejudice." *State v. Spargo*, 364 N.W.2d 203, 208 (Iowa 1985). The reports also "consisted largely of facts which were ultimately introduced at trial." *Siemer*, 454 N.W.2d at 861. And while one of the reports contained a quote from P.M.'s son in which he expressed hurt at the loss of his first home, such a quote is not significant enough to spur the presumption of prejudice when taken as a mere part of reporting on the whole story later tried in court. *See, e.g.*, *id.* (declining to presume prejudice from a reported nonfactual allegation of abuse when viewed in the context of all evidence reported and admitted at trial).

The timing of the pretrial publicity is also not beneficial to Glynn's argument. There was a two-month gap between any pretrial publicity—of which all reports on the underlying events occurred within the three days of the fire—and the start of the trial. A time lapse of two to three months between the last reporting and the

start of trial can sufficiently "dissipate any prejudicial effect that may have been created initially by adverse publicity." *Spargo*, 346 N.W.2d at 208.

Finally, we do not agree with Glynn that the record on voir dire signals the publicity was pervasive and inflammatory enough to presume prejudice. While it is true over half of the potential jurors were questioned individually after their answers to a juror questionnaire suggested some prior case knowledge, "mere exposure to news accounts will not create a presumption of prejudice." *Siemer*, 454 N.W.2d at 861. Roughly half of the potential jurors who were excused were released exclusively due to their prior knowledge or opinion of the events. A handful of potential jurors remained in the jury pool without objection after questioning despite having some prior knowledge. The rest of the excused potential jurors were let go for reasons that included being a victim of similar crimes, having familiarity with a potential witness, working previously as law enforcement, and holding bias against the State due to their own previous conviction.

So we do not agree with Glynn, who likens these facts to *Robinson* and claims "[t]here was a barrage of unmistakable warning signals that few people had an open mind." 389 N.W.2d at 403. Here instead, "the court exercised abundant caution in dismissing for cause the venire persons" whose prior knowledge of the events, prior experiences with similar crimes, or prior acquaintance with potential witnesses or law enforcement affected their ability to serve fairly. *Siemer*, 454 N.W.2d at 861. We conclude the district court did not abuse its discretion in denying Glynn's motion for change of venue.

### III. Sufficiency of the Evidence

Glynn also challenges the sufficiency of the evidence supporting his convictions. We review sufficiency of the evidence challenges for errors at law. *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). Courts "reviewing challenges to the sufficiency of evidence supporting a guilty verdict . . . consider all of the record evidence viewed 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (quoting *State v. Keopasaeuth*, 645 N.W.2d 637, 640 (Iowa 2002)). "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." *Id.* (quoting *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006)).

A jury verdict supported by substantial evidence will not be overturned. *Crawford*, 972 N.W.2d at 202. "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Sanford*, 814 N.W.2d at 615.

### A. First-Degree Arson

The jury was instructed that the State had to prove these elements of first-degree arson:

> 1. On or about the 1st day of May, 2023, the defendant caused a fire or explosion in or near the property of [P.M.'s address], Boone, Iowa 50036.
> 2. The defendant specifically intended to destroy or damage property, or knew the property would probably be destroyed or damaged.
> 3. The presence of a person, other than the defendant, in or near the property, could have been reasonably anticipated.

Glynn challenges the sufficiency of the evidence on each element. Glynn begins his argument by proposing alternative possible causes of the fire and claiming these alternative causes were not ruled out. We reject this argument.

The State produced circumstantial evidence that Glynn caused the fire. Not only can circumstantial evidence be as probative as direct evidence, but it is often the only kind of evidence which can be relied on to prove arson, as "there are seldom witnesses to the crime." *State v. Vaughan*, 859 N.W.2d 492, 498 (Iowa 2015) (quoting *State v. Veverka*, 271 N.W.2d 744, 747 (Iowa 1978)). Among the evidence presented was testimony of the following: the fire started while Glynn was within the home having a standoff with police; Glynn spoke on the phone with a responding officer during the standoff and said, "to get the other officers away from the house because he was going to blow it up"; and Glynn had made threats to burn things down or blow things up. The State also presented video evidence in which Glynn said he wanted to die in the house because "I know it means something to her." Despite Glynn's stance on possible alternative causes, the jury was free to reject Glynn's perspective and credit the State's evidence as more probative. That evidence was sufficient for the jury to find Glynn caused the fire.

For similar reasons, the challenge to the specific-intent element falls short. Glynn's challenge tries to rework the factual narrative surrounding his acceptance of the deteriorating relationship with P.M., attempts to undermine the probative value of P.M.'s testimony describing Glynn's past physical and psychological abuses, and presents conditions on the day of the fire as evidence that the fire was neither planned nor foreseeable. Like the jury's prerogative in crediting or rejecting certain evidence, *see Sanford*, 814 N.W.2d at 615, deciding the weight to be given

to witness testimony is a duty generally within the jury's exclusive authority. *See State v. Ferguson*, 6 N.W.2d 856, 858–59 (Iowa 1942) (rejecting the defendant's argument the jury improperly credited the testimony of the State's witnesses). The jury was within its authority to credit P.M.'s testimony and weigh it together with the circumstantial evidence presented. *Cf.* Iowa R. Crim. P. 2.21(3) ("Corroboration of the testimony of victims shall not be required."). The evidence supports a finding that Glynn intended to damage or destroy P.M.'s property with a fire or explosion.

Glynn also claims the evidence proved his partial defense of intoxication, which if true could negate the specific intent required for conviction. *See State v. Caldwell*, 385 N.W.2d 553, 557 (Iowa 1986). Negating specific intent based on the defendant's intoxication traditionally requires the defendant to be so highly intoxicated that it was impossible for the defendant to form the intent required for conviction. *State v. Cordero*, 861 N.W.2d 253, 259–60 (Iowa 2015), *overruled on other grounds by Alcala v. Marriott Int'l*, 880 N.W.2d 699 (Iowa 2016). Whether that level of intoxication existed was for the jury to decide. *State v. Wilkens*, 346 N.W.2d 16, 20–21 (Iowa 1984).

Little evidence supports Glynn's defense. Glynn relies on this court's prior ruling in *State v. Fortune*, No. 16-0360, 2017 WL 2875866, at *1 (Iowa Ct. App. July 6, 2017), in which we found the intoxication argument unpersuasive, to distinguish these facts. We believe an analogy is more appropriate.

As in *Fortune*, Glynn demonstrated an ability to plan, motor-skill control, and mental alertness. *See* 2017 WL 2875866, at *5. Shortly before the standoff with police began, Glynn sent his friend clearly articulated text messages planning to

sell certain tools and pieces of equipment. He sent descriptions and valuation estimates along with pictures of the items. But upon law enforcement's arrival, he messaged, "never mind think the law is here," shortly followed by, "Peace bro I'm not gonna come out alive." A responding officer testified that once the fire had nearly engulfed P.M.'s house, Glynn exited the back door through the only remaining clear route and took cover in the adjacent freestanding garage. As the fire spread from the house to the garage, Glynn moved toward the next shelter. Video evidence also showed that after he was taken into custody, Glynn understood where he was and what was happening, and he communicated effectively with care providers. "This intoxication argument is not persuasive." *Id.* at \*5.

The sole basis for Glynn's challenge to the final element ignores the fact that Glynn was fully aware law enforcement was surrounding the house. To be sure, in the initial phone contact between Glynn and responding officers, Glynn said to get the other officers away from the house because he planned to blow it up. We do not entertain any question about Glynn's awareness of their presence. The presence of someone other than Glynn on or near the property was more than foreseeable; it was evident.

Viewed in the light most favorable to the State, the record contains substantial evidence of each of the three elements required to convict on first-degree arson.

**B.      Possession of Ammunition by a Prohibited Person**

As to this conviction, Glynn only challenges the sufficiency of the evidence on one element of the possession of ammunition conviction—whether he knowingly possessed the ammunition.  Jury Instruction no. 32 provided:

> The law recognizes several kinds of possession.  A person may have actual possession or constructive possession . . . .
> A person who has direct physical control over a thing on his person is in actual possession of it.
> A person who, although not in actual possession has both the power and intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is in constructive possession of it.  A person's mere presence at a place where a thing is found or proximity to the thing is not enough to support a conclusion that the person possessed the thing.
> . . . .
> Whenever the word "possession" has been used in these instructions, it includes actual as well as constructive possession . . . .

Glynn claims the evidence is insufficient for either actual or constructive possession.

Evidence to prove actual possession can be either direct or circumstantial. *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014).  The point is "that contraband was in [the defendant's] physical possession at some point in time."  *Id.*

From the evidence presented, a jury could infer Glynn had actual possession of ammunition.  It is undisputed Glynn was the only person in the house.  Glynn was breaking out windows and throwing items out of the house.  P.M. testified shotgun ammunition was in the house in an easily accessible spot known to Glynn.  During one phone call between Glynn and responding officers that afternoon, Glynn said, "Do I gotta start poppin' rounds off out there to get [P.M.] to answer the phone?"  Three officers testified they later saw a box of

shotgun shells fly out of the house's front door minutes before any signs of smoke appeared. To all three, the box appeared to be on fire. A fourth officer heard the sound of un-chambered shotgun shells exploding. These facts provide evidence Glynn knowingly threw the box of ammunition out of the house. The evidence, reviewed in the light most favorable to the State, was sufficient for a jury to conclude the box of ammunition was in Glynn's possession before being thrown from a window. Sufficient evidence exists in the record to support the conviction for unlawful possession of ammunition.

## C.     Third-Degree Burglary

The final challenge Glynn presents is to his third-degree burglary conviction. His challenge only attacks the sufficiency of the evidence presented on the specific intent element required to convict. Jury Instruction no. 34 explained, to convict, the jury needed to find Glynn had "the specific intent to commit a theft, assault, or [a]rson." We conclude sufficient evidence was presented for a rational jury to find beyond reasonable doubt that Glynn held the required specific intent.

Under Iowa law, the specific intent required for a burglary conviction can be found even if the intent was formed after the defendant's initial entry of the building. *State v. Walker*, 600 N.W.2d 606, 609 (Iowa 1999). "If the defendant remains on the premises after having reason to know he has no right to do so," the defendant is said to have unlawfully remained. *Id.* If while unlawfully remaining on the premises the defendant forms the intent to commit one of the enumerated crimes, the intent necessary for a burglary conviction may be found. *Id.*; *see, e.g.*, *State v. Church*, No. 20-2045, 2020 WL 6484052, at *5 (Iowa Ct. App. Nov. 4, 2020).

Having found above that evidence was sufficient to support the jury's conviction for first-degree arson, we find substantial evidence also supports the jury's finding that Glynn committed first-degree burglary. Glynn was subject to a no contact order, which prohibited him from going to P.M.'s residence. Despite the order, Glynn entered the residence and remained there unlawfully even after law enforcement arrived. Finally, as discussed above under first-degree arson, the evidence shows Glynn formed the intent to destroy or damage P.M.'s property with either fire or explosion. Viewing this evidence in the light most favorable to the State, we find there was sufficient evidence for a rational jury to convict Glynn on the first-degree burglary charge.

## IV. Conclusion

We affirm the district court's ruling on the motion for change of venue and conclude sufficient evidence exists to support the convictions on the three challenged convictions.

**AFFIRMED.**